## THE SWALLOW.[1]

### ALLEN v. SEVEN HUNDRED AND EIGHTY-FIVE TONS OF COAL.

*(District Court, E. D. New York.   March 29, 1886.)*

DEMURRAGE—DESIGNATION OF WHARF—IMPROPER PLACE.

The ship Swallow, laden with coal, arrived in New York harbor, January 29th. Her charter-party provided that she should discharge at a wharf designated by consignee, "not above East-river bridge." The consignee designated a wharf above the bridge, and where there was not sufficient water for the ship. This place the ship rejected, and, it being dangerous for her to remain in the stream on account of ice, she went to Boston wharf. On February 12th, no other place having been offered mean time, after notice to the consignee, she began to discharge at Boston wharf. On the following day the consignee sent lighters, into which the rest of the coal was delivered; and on February 22d the discharge was completed. Twenty days elapsed between the time that she was ready to discharge and the time when the coal was all out. At the rate fixed by the charter, she could have been discharged in eight days. *Held*, that the ship was entitled to recover demurrage, at the charter rate, for twelve days.

In Admiralty.

*Wilcox, Adams & Macklin*, for libelants.

*Souther & Steadman*, for claimants.

BENEDICT, J.   The case presents a question in respect to demurrage, between the owner of the ship Swallow and the consignee of a cargo of coal, laden on board that ship at Leith, in pursuance of a charter-party. The charter-party contained a provision that the coal should be delivered in New York according to the bills of lading; and also provided that the consignee of the coal at New York should receive the same "from along-side the ship, not above East-river bridge, at a wharf designated by them; ship to discharge at the rate of 100 tons per working day during the regular custom-house hours, sufficient depth of water being provided along-side the wharf, the ship paying wharfage, and so end the voyage; demurrage, if any, to be paid at the rate of four pence sterling per ton register *per diem*." The bill of lading provided for the delivery of the coal at the port of New York, the danger of the seas excepted, to Perkins & Co., on their paying freight for the goods, with all other conditions as per charter-party. The charter-party also gave the ship the privilege of loading, for the ship's benefit, a quantity of paper stock above the coal.

The ship arrived in New York harbor, January 29th. The consignee was on the same day notified of her arrival, and then designated the foot of Fourteenth street as the place selected for the landing of the coal. The place thus designated was not in conform-

[1] Reported    P. D. & Wyllys Benedict, Esq., of the New York bar.

ity with the charter, because not only was it above the East-river bridge, but the bulk-head had not sufficient water for the ship. The place was therefore rejected, and as at the time the ice running in the harbor rendered it dangerous for the ship to remain in the stream, she proceeded to Boston wharf, where she was duly berthed on January 30th. There she discharged the paper stock, the same being all discharged by February 4th. No other place for the discharge of the coal having been designated by the consignee, nor lighters sent to remove the coal from along-side the ship, on February 11th the discharge of the coal at Boston wharf was commenced, after notice to the consignee. On the next day the consignee sent lighters, into which the rest of the coal was delivered along-side the ship, as she lay at Boston wharf. On February 22d the discharge of the coal was completed.

At the rate of 100 tons per day, 8 days would have been used to discharge the coal. The time that elapsed between the time when the ship was ready to discharge at Boston wharf and the time when the coal was all out was 20 days. Allowing 8 days of this as the time to be used by the consignee in receiving the coal, leaves 12 days of detention, for which the libelant claims demurrage at the rate of $97 per day.

It has scarcely been contended that the ship was bound to go to Fourteenth street; not only was it above the bridge, but there was not sufficient water. The main ground upon which the claim to demurrage is disputed is that the designation by the consignee of Fourteenth street as a place of discharge gave the ship the right at once to discharge the coal on Boston wharf, and that her delay up to February 11th to commence to discharge there was caused by her own procrastination, and not by the consignee. But it is to be considered that it was known to all that the coal was not intended for general use, but for the use of the gas company, at Fourteenth street. Every one knew that Boston wharf was not where the coal was wanted. The ship, therefore, had the right to suppose that the consignee would either send lighters to take the coal from the ship at Boston wharf, or designate some other place for the discharge. No lighters were sent to the ship until February 12th. This was not because of ignorance as to where the ship was, but the time was consumed by the consignee in an effort to induce the ship to go to Fourteenth street. The consignee having no right to require the ship to go to Fourteenth street, if unable to designate another place of discharge, should have sent lighters to receive the coal along-side the ship at Boston wharf. By so doing the consignee would have received his coal without delay to the ship. The omission by the consignee to send lighters was for the sake of taking the chance of inducing the ship to go to Fourteenth street. The consignee having taken the chance, and lost, the delay that resulted should be at his expense, and not at the expense of the ship.

My conclusion is that the libelant, Mary E. Allen, is entitled to recover for 12 days' demurrage, at the rate of $97 per day, and for the same reason the libelant is entitled to recover the freight without deduction for wharfage or lighterage.